NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

NO. 29525

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee, v.
JOE D. AKUNA, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 07-1-1632)

MEMORANDUM OPINION
(By: Foley, Presiding J., Fujise, and Leonard, JJ.)

Defendant-Appellant Joe D. Akuna (Akuna) appeals from
the Judgment of Conviction and Sentence (Judgment) filed in the
Circuit Court of the First Circuit[1] (circuit court) on
November 24, 2008.

A jury found Akuna guilty of Sexual Assault in the
Second Degree, in violation of Hawaii Revised Statutes (HRS)
§ 707-731(1)(a) (Supp. 2008) (Count I); Sexual Assault in the
Fourth Degree, in violation of HRS § 707-733 (1993) (Count II);
and Attempted Sexual Assault in the Fourth Degree, in violation
of HRS §§ 705-500 (1993) & 707-733 (Count III). The circuit
court sentenced Akuna to ten years of imprisonment, with a
mandatory minimum of three years and four months for Count I, and
one year of imprisonment for each of Counts II and III. The
sentences were to run concurrently with each other.

On appeal, Akuna contends the circuit court erred and
violated his constitutional rights

(1) to a fair trial by denying his motion to exclude
from evidence at trial additional statements made by the
Complainant (Complainant) to the State of Hawai'i (State) Deputy
Prosecuting Attorney (Prosecutor), which statements Prosecutor
failed to disclose to Akuna until the day of trial;

---

[1] The Honorable Michael A. Town presided.

(2) to confrontation, to present a defense, and to a fair trial when the court denied his request for a mistrial after he was precluded from impeaching Complainant's credibility through questioning of Prosecutor, who was the only witness to whom Complainant had made her prior inconsistent statements; and

(3) to confrontation, to present a defense, to a jury trial, and to a fair trial, when the court conducted its own questioning of Complainant and read the court's own finding of fact (FOF) to the jury regarding Complainant's prior statement.

Akuna argues in the alternative that even if it were proper for the circuit court to read the FOF to the jury, the court erred by failing to explain to the jury what is an FOF and how the jury should evaluate one.

Akuna requests that we vacate his conviction and remand this case for a new trial.

## I. BACKGROUND

Pretrial

On July 28, 2008, the circuit court held a hearing on the motions in limine. Akuna's counsel (Defense Counsel) asked the circuit court to preclude from evidence at trial statements Complainant had made to Prosecutor the previous day. Prosecutor had disclosed the statements to Defense Counsel that morning. Prosecutor stated that she had interviewed Complainant in preparation for trial about ten days prior to the hearing on the motions in limine (first interview), but Complainant did not tell Prosecutor until the interview the previous day (second interview) that Complainant and Akuna had engaged in the following dialog at the time of the incident: Akuna asked Complainant, "Do you want to fool around with anyone?" Complainant told him, "No. I'm not like that." Akuna responded, "Your husband will cheat on you when he's deployed." Complainant said, "Our relationship isn't like that." Akuna said, "Whatever happens happens."

Prosecutor stated that she disclosed the statements to Defense Counsel, pursuant to the requirements of Hawai'i Rules of

Penal Procedure (HRPP) Rule 16,[2] and the State intended to use the statements at trial. No third party was present when Complainant made the statements. Defense Counsel argued that the circuit court should exclude the statements from evidence because "at this point it's kind of late and [it] unfairly burdens the defense."

The circuit court orally ruled that it would not exclude the statements from evidence.

Trial

Complainant testified that on August 23, 2007, she spent the night with her friend, Fayne, at the house (the House) belonging to Fayne's mother, Auntie Ray. Complainant's fiancé (who was her husband at the time of trial) was at basic training in Georgia on August 23. He had left for basic training on August 16, 2007 and was to return to Hawai'i in March 2007. Fayne invited Complainant to stay the night because Fayne did not want Complainant to be alone. Complainant had previously spent the night at Fayne's on August 18, 2007.

After driving to Makaha, Complainant, Fayne, and Fayne's girlfriend, Ali, returned to the House at around 11:00 or 11:30 p.m. and hung out at the bus, where Fayne lived, that was parked next to the House. Fayne's brother, Fred, showed up with Akuna. At around 1:20 a.m., Complainant went to sleep on the couch in the House and Fayne went to sleep in her bus. Complainant chose to sleep in the House because there were

---

[2] HRPP Rule 16(b)(1)(i) and (vii) provides that

[t]he prosecutor shall disclose to the defendant or the defendant's attorney the following material and information within the prosecutor's possession or control:

(i) the names and last known addresses of persons whom the prosecutor intends to call as witnesses in the presentation of the evidence in chief, together with any relevant written or recorded statements, provided that statements recorded by the prosecutor shall not be subject to disclosure;
. . . .

(vii) any material or information which tends to negate the guilt of the defendant as to the offense charged or would tend to reduce the defendant's punishment therefor[.]

roaches in the bus.  In the House, Fayne's Uncle Milton was in one bedroom; Fred and his brother, Patrick, in another bedroom; Auntie Ray and her boyfriend, Chico, in another bedroom; and Auntie Ray's friend, Rambo, in another bedroom.

Complainant slept on a couch in the living room.  She could not sleep in any of the bedrooms because they were all occupied.  Adjacent to and behind the couch was a bed, on which Akuna slept.  When Complainant had spent the night at the House on August 18, she, Akuna, and Rambo had slept in the living room in the same positions and nothing unusual had happened, so she trusted Akuna.

Complainant testified that from about 12:30 to 1:20 a.m., she and Akuna talked in the living room about Akuna's family, among other things.  On direct examination, Prosecutor and Complainant engaged in the following discussion:

> Q  [Prosecutor]  On the night that this happened, in other words, the second time that you slept over, did [Akuna] say anything to you about your husband being on leave?
>
> A  [The Complainant]  He told me that soldiers that went to basic training would fool around and basically I couldn't count on him to be faithful to me.  So, you know, whatever happens happens.
>
> Q  Did you say anything to [Akuna] when he said that you couldn't count on your husband being faithful?
>
> A  I told him that our relationship wasn't at all like that.  And we had trust, you know, since we were friends before we even went out.  And our relationship was mature.
>
> Q  What did you mean by that?
>
> A  We could trust each other.  We weren't, you know, into playing games or anything.  We were up-front with each other.  We told each other everything.

Complainant testified that she did not flirt with Akuna in any way and he did not flirt with her.  On cross-examination, Complainant testified that when she was talking with Akuna, he was sitting on a love seat next to the couch and she was sitting on the couch.

In the early morning, Complainant woke up because she felt something tapping on her leg and found Akuna's hand "right on [her] leg going by [her] private [genital] area."  Complainant was wearing loose-fitting shorts, a tanktop, underwear, and a

bra. Akuna's hand was underneath the leg area of her shorts, on top of her underwear. As far as Complainant knew, Akuna was sleeping. His hand was over the back of the couch. Complainant was shocked and could not breathe, but she thought at first it might have been an accident and that Akuna just usually put his hand over the back of the couch when he slept.

Complainant pushed Akuna's hand away and covered herself with her blanket. She wrapped herself in the blanket because if it happened again, she wanted to make sure she knew whether it was a mistake. First, Akuna's hand stayed where she had pushed it, but a couple of seconds later, it returned to where it was, only underneath her underwear, and his fingers were between her labia and by her clitoris, but not touching it. Complainant panicked and felt violated and helpless. She grabbed Akuna's hand to pull it out and he resisted, so she grabbed his hand with both of her hands, turned, and pulled out his hand.

Seconds later, Akuna climbed over the back of the couch and tried to pin her down with his shoulder, using his weight. She knew it was Akuna because he had been wearing a white tank top, he had body odor, and his breath stank and she had noticed the body odor earlier that evening. Complainant testified that Akuna then "started to like feel me up." He tried to go underneath her bra and back into her underwear, to touch her genitals. Complainant was lying on her side. Akuna put his hands on her breasts and squeezed them.

Complainant testified that when Akuna was assaulting her, she felt nasty, violated, dirty, and defiled. She had never initiated any type of sexual contact with him, had not kissed him that night, and had never wanted to have any kind of sexual relations with him. She had not given Akuna permission to put his fingers inside any part of her body, to sexually penetrate her in any way, to have any type of sexual contact with her, or to touch her. Complainant was menstruating that night and was wearing a sanitary pad.

Complainant could not slide off of the couch because the blanket was wrapped around her. She was able to break free from Akuna after pushing harder against him. No one in the house

ever came to the scene. Complainant did not scream because she was caught off guard and panicked and could not breathe. Complainant walked outside to Fayne's bus and told them what happened. Fayne called Fred, and Fred called the police.

On cross-examination, Defense Counsel questioned Complainant about the second interview with Prosecutor:

> Q [Defense Counsel] Now, whenever you spoke with [Prosecutor] Sunday, did you tell her anything else about other statements that were made by [Akuna]?
>
> A [Complainant] No. I just told her what I told her, that those days previous before Sunday was just reclarifying everything.
>
> Q So you didn't tell [Prosecutor] anything else about any other statements that [Akuna] made to you during that night?
>
> A No.
>
> Q Did you tell her anything about that you said [Akuna] said something to the effect that -- asked if you wanted to hook up?
>
> A No.
>
> Q Or get together or something like that?
>
> A No.

The circuit court called a recess and questioned Prosecutor out of the presence of the jury:

> THE COURT: For the record, [Prosecutor], as best you can recall, without getting a transcript out of what you earlier said, on Sunday you had a conversation with [Complainant] that you dutifully told the Court and [Defense Counsel] about; correct?
>
> [PROSECUTOR]: Yes, Your Honor.
>
> THE COURT: As best you can recall, what did this witness tell you at that time?
>
> [PROSECUTOR]: [Akuna] said to her, "Don't you want to fool around."
>
> THE COURT: Speak up a little bit.
>
> [PROSECUTOR]: I'm sorry, Your Honor.
>
> [Akuna] said to her, "Don't you want to fool around with anyone." And she said, "No."
>
> THE COURT: What else?
>
> [PROSECUTOR]: "Your husband will cheat on you in basic training." And she said, "Our relationship isn't like that, I'm not like that."

THE COURT: Anything else?

[PROSECUTOR]: And then he said, "Whatever happens happens."

THE COURT: Is that satisfactory, [Defense Counsel]?

[DEFENSE COUNSEL]: That's fine.

[PROSECUTOR]: I'm not exactly sure the order anymore, Your Honor. That's the best I can recreate it.

THE COURT: Be that as it may, it's always good to have a third party there. I'm not going to get too excited unless I need to.

After the bench conference, Defense Counsel resumed his questioning of Complainant in open court regarding statements she had allegedly made to Prosecutor:

Q [Defense Counsel] You never told [Prosecutor] that [Akuna said something to the effect of, "Don't you want to fool around with anyone?"].

A [Complainant]: It wasn't to where he said, "Don't you want to fool around." It was like he was hinting where he told me, "Things happen." But I was explaining to him the relationship me and my husband had. He told me, "Things happen."

Q Did you tell [Prosecutor] that [Akuna] told you or asked you, "Don't you want to fool around"?

A Not those words.

Q Okay. But you are saying now that he hinted something?

A That was after the event had occurred and I was going back through all my -- what had happened. I told [Prosecutor] that when we were having the conversation, me and [Akuna], that's what he said.

Q When you were having the conversation with [Akuna] between 12:30 and 1:20 in the morning, he said something or insinuated something about fooling around?

A Yes.

Q What were the words that he used then?

A He said, "Things happen."

Q "Things happen."

And then I think you covered -- he made some comment about your husband will cheat on you during basic training?

A Yes.

Q And you took that comment, "things happen," in conjunction with your husband will cheat on you during basic training as some sort of an implication about you wanting to fool around?

A  Yes.  But not with him.  But just him saying, you know, my husband is going to fool around, so I should -- it's going to happen to me as well, I'm going to want to do that.

Q  So you took it as you -- something implicating that -- about you fooling around, but not with him.

A:  Yes.

Defense Counsel asked Complainant if she mentioned "anything about these comments" in her police statement, her interview with the police, or her Grand Jury testimony, and Complainant answered that she had not.  Complainant testified that she had told Prosecutor about the comments not only during the second interview, but during the first interview as well.

On redirect examination, Prosecutor asked Complainant if Akuna had ever said he wanted to hook up or get together with Complainant or ever asked her, "Do you want to fool around?", and Complainant responded in the negative.  Complainant testified that when Akuna told her, "Your husband will cheat on you during basic training," Complainant took that to mean that Akuna was "trying to tear me down."  Complainant told Akuna that her then-fiancé would not cheat on her because their trust and relationship were strong.  Complainant did not in any way think that Akuna was attracted to her.

Fayne and Fred's Testimonies

Fayne's testimony was substantially similar to Complainant's.  She testified that she did not see Complainant and Akuna flirting on the night of the incident.  Fred's testimony was also substantially similar.  He testified he did not see  Complainant flirt with Akuna or express any interest in being with Akuna as boyfriend-girlfriend.

Nadine T. Salle, M.D.'s Testimony

Nadine T. Salle, M.D., (Dr. Salle) testified that on August 24, 2007 she treated Complainant in connection with this incident.  Dr. Salle stated that Complainant's findings were essentially normal and showed a young woman who was menstruating. Dr. Salle testified that a person could touch another person's labia and clitoris without creating any signs of trauma or transferring DNA.

8

Testimony regarding evidence on Akuna's hands, fingernails

Honolulu Police Department (HPD) Officer Crabbe testified that on August 24, 2007, he was dispatched to the House, where he interviewed Complainant. While at the House, Officer Crabbe arrested Akuna for sexual assault. The officer inspected Akuna's hands and observed a reddish brownish substance on Akuna's "fingernails where the fingernail and skin meet."

Hugh Okuba (Okuba), an HPD evidence specialist at the time of the incident, testified that he swabbed Akuna's hands for biological evidence and scraped Akuna's fingernails for trace evidence.

Barrie Chua-Chiaco (Chua-Chiaco), a specialist in DNA analysis, testified that he performed testing on reference buccal swabs from Akuna's mouth (State's Exhibit 1) and Complainant's mouth (State's Exhibit 2), scrapings from Akuna's right-hand fingernails (State's Exhibit 3), and a swab sample from Akuna's right hand (Exhibit 4). Chua-Chiaco tested all of the exhibits for DNA and also tested Exhibit 3 for blood.

*Exhibit 4*. Testing of Exhibit 4 showed the presence of blood, but the blood could not be identified as human in origin. That meant there may have been no human blood present or that human blood was present, but at too low a level to detect. DNA testing of the sample revealed two DNA components, or the DNA of two individuals. One of the DNA component profiles matched Akuna's DNA profile. No conclusions could be reached regarding the origin of the other DNA component.

*Exhibit 3*. Chua-Chiaco testified that he did not test the fingernail scrapings for blood because there was a very limited amount of sample present and he had to choose between testing it for blood and testing it for DNA. The DNA test was more important and showed a mixture of two individuals' DNA. Complainant could be included as a possible contributor to the DNA profile obtained, and Akuna could not be excluded as being a possible contributor to the profile. Chua-Chiaco saw all the same DNA characteristics in Exhibit 3 that he had seen when he examined Complainant's characteristics in Exhibit 2. When asked

how likely it was that the Complainant's DNA was present in Exhibit 3, Chua-Chiaco said that conservatively, there was a 1 in 1.2 million chance that it was not Complainant's.  There was more female DNA than male DNA in Exhibit 3.  On cross-examination, Chua-Chiaco stated he could not tell if Exhibit 3 contained blood and the sample could have been the result of something as small as a scrape along the skin.  Chua-Chiaco testified that there would probably not be a transfer of DNA from a hug.

### Sandra Tam's testimony

Sandra Tam, a worker at the victim-witness assistance division at the City and County of Honolulu Prosecutor's Office, testified that she was present at Prosecutor's interview of Complainant one or two weeks before trial commenced and she did not think that Complainant attributed any statements, including "Do you want to fool around with anyone?", to Akuna, during the interview.

### Akuna's testimony

Akuna testified that on August 23, 2007, he had been living at the House for three weeks, helping around the house and with the pigs.  That evening, he was reading in bed when he and Complainant began talking.  While they were talking and looking at photographs of Akuna's children, Complainant told Akuna, "God, you got beautiful eyes."  Akuna said, "Yeah.  My children are Italian-Hawaiian-Chinese-Spanish."

Akuna testified that at some point, the generator shut off and the lights went out.  He told Complainant he was going to go to sleep.  Akuna testified that he was sitting up in bed when Complainant "grabbed my right hand, put my [right] hand between her legs, and goes, 'Do you want some?'."  Akuna testified that "she had [his] fingers on the . . . end of her shorts toward her vagina area."  He testified that "it felt really awkward 'cause, God, it's like moving too fast, huh.  It was a really fast move. And I kinda suddenly felt uncomfortable about where that led to." He had not touched Complainant at all that day, prior to the incident.  Akuna testified that he said, "What?"  And [he] was just really in shock."  He stated that he "told her, 'This is not right.  It's disrespectful for aunty and for her friends.'"

Akuna pulled his arm away from Complainant, pushed her back, and told her, "This is not good" and "You need to get out of the house." He told her he would tell Fayne and Aunty Rae about it in the morning. Complainant got up from the couch, heading toward the kitchen, and Akuna fell asleep. The next thing he remembered was being woken up and arrested.

Akuna could not tell if there was any blood because it was too dark and the incident happened so quickly.

Akuna testified that prior to grabbing his hand, Complainant had not really indicated that she was attracted to him. Akuna stated that he was not attracted to or sexually interested in the Complainant. When asked if he ever tried to touch Complainant's crotch area or put his hands inside of her panties, Akuna responded in the negative.

Akuna testified that at the time of the incident, he did not know if Complainant was engaged, but only that she had a boyfriend.

### Motion for Mistrial

After Dr. Salle testified, Defense Counsel moved for a mistrial, arguing the following with regard to Complainant's statements to Prosecutor regarding comments Akuna allegedly made to Complainant at the time of the incident:

> The other issue which perhaps necessitates a mistrial is from last week with the witness issue, [Prosecutor] being a witness. I believe the issue with that and I -- if there's some other alternative to solve it without declaring a mistrial, that's fine. But the problem is there's a couple different problems on that. One, there were two times at which [Prosecutor] put on the record before we started trial and were read into the record, then they were even read a second time during the trial on what they are, statements attributable to my client that [Complainant] had allegedly told [Prosecutor] Sunday when [Prosecutor] met with [Complainant] on Sunday, whenever the witness was then on the stand.
>
> In one of those two statements, [Complainant] basically flat out denied that she had told [Prosecutor] that. Something to the extent of, well, it was -- this was kind of a -- I forgot the term [Complainant] used, if it was a perception or something, but it wasn't that. [Complainant] said that [Akuna] said. That's the problem. You know. That's why I didn't want these statements to come in because this is the problem that explodes from these statements. [Prosecutor] specifically said that was not a feeling or something else. In an ordinary case had it been a regular person other than [Prosecutor], I could put them

11

on and say that was a statement. But [Prosecutor] is a prosecutor. I can't say that.

The second problem, [Prosecutor] said [Complainant] had told [Prosecutor] of that the first time. That's why I had only learned about it. The second time [Prosecutor] called me, Sunday night, I didn't get the message 'til Monday morning on it. On the stand [Complainant] said not only did I tell [Prosecutor] on Sunday, I had told her -- I think [Prosecutor's] representation -- the court met with her ten days ago or ten days prior. She never mentioned it. [Complainant's] representation was I think five days prior. And [Complainant] had told [Prosecutor] about these statements, the five or six days prior, whenever [Complainant] talked to [Prosecutor]. That's another area that, you know.

I don't know that we asked [Prosecutor] if this [sic] was a witness there for the earlier statement. I know [Prosecutor] said on the one on Sunday that she was the only other person there, but, you know, that's a second issue that I would definitely go into on cross-examination and say, you know, she's not being honest. And this case is all about the credibility of [Complainant]. That's what it hinges on. That's everything in this case.

And any attack I can have on the credibility of [Complainant] I'm going to use. And those are two attacks that I should be able to attack her credibility on. But because [Prosecutor] is the only witness that I can call to impeach [Complainant], I think that would necessitate a mistrial unless there's some other avenue, you know, stipulate. I mean even if we stipulated, [Prosecutor] would say that she is still a witness, so.

With regard to the first basis for moving for mistrial, Defense Counsel explained that the inconsistency between what Complainant allegedly told Prosecutor prior to trial and what Complainant testified to at trial was the following:

[DEFENSE COUNSEL]: I believe what [Complainant] testified to in court was that she never -- that [Akuna] -- she never told [Prosecutor] that [Akuna] said "Don't you want to fool around with anyone?" What [Complainant's] testimony was was something to the effect of she got that feeling or something, but he never said that. That's never a statement that he said because that was the main inconsistency here.

Regarding the second basis, Defense Counsel explained:

[DEFENSE COUNSEL]: . . . My argument's going to be none of that stuff was said. But at this point, yes, [Complainant is] embellishing or making up additional things or adding to her story to try to embellish her story. The second part of that and where I think there's an inconsistency is that she has testified and her earlier statements were that she never got any feeling that there was any attraction. There was never any, you know, flirting or anything going on between them. And then if that's the case though, if she's -- if her statement was in fact to [Prosecutor] that he said "Don't you want to fool around with anyone," then I think that could be argued as, you

know, being inconsistent with her statement that there was
not any flirting happening back and forth.

Prosecutor stated that she had no memory of Complainant telling her about Akuna's comments in the first meeting.

The circuit court proposed having Prosecutor stipulate to the statement made on July 27th to her by Complainant regarding Akuna's comments. Prosecutor stated she would have no problem doing so. However, Defense Counsel stated that he was opposed to such a stipulation because it would effectively bolster Complainant's testimony, since the jury would have the sense that despite inconsistencies in Complainant's testimony at trial and her statements to Prosecutor prior to trial, the State decided to prosecute. The circuit court proposed informing the jury that the court had made an FOF regarding what Complainant told Prosecutor during the second interview. The circuit court then questioned Complainant _in camera_:

Q [THE COURT] Okay. Do you remember what you told [Prosecutor] about what [Akuna] said or didn't say on the, uh, 24th day of August, 2007 when he was talking to you about your husband in the National Guard? Do you remember what he may have told you?

A [Complainant] I remember I told [Prosecutor] that after the fact everything happened I went over what happened that night and I told her that I remember him saying "What happens, happens."
. . . .

Q Regarding when people are at boot camp or National Guard camp; is that right?

A Yes.

Q Um, did [Akuna] say anything that was close to this, "Don't you want to fool around with anyone?" Do you remember him saying that?

A Not that I remember. I can't remember.

Q You can't remember. You understand that I was told that's what you said to [Prosecutor] that day? Would you be surprised to know that she remembers you saying that?

A No.

Q What?

A If she remembers me saying that --
. . . .

A -- then --

Q That's what she said; right?

A  Right.  Yeah.

.    .    .    .

Q  . . . But if [Prosecutor] told me in this very court that Monday the 28th, not even a day after you talked to her -- do you understand that --

A  Um-hmm.

Q  -- [Prosecutor] told me that you told [Prosecutor] words to the effect that [Akuna] said "Don't you want to fool around with anyone?," that doesn't refresh your recollection that's what you told [Prosecutor]?

A  All I can remember is what I told you, not -- I just told her what I know, what I remembered.

Q  Okay.

A  That's all I can remember.

Q  And what do you remember?

A  When he said things happen.

Q  Things happen?

A  Yeah.

Q  "Whatever happens, happens"?

A  Yes.

Defense Counsel argued that if the circuit court made its proposed finding, it would bolster Prosecutor's credibility.

Just before the defense and State rested their cases, Defense Counsel and Prosecutor both objected to the circuit court's giving an FOF regarding what Complainant told Prosecutor at the second interview about Akuna's comments during the incident.  Prosecutor stated that she would also object to being called as a witness to testify regarding what Complainant told her.  The circuit court decided to give the FOF over both parties' objections and told Prosecutor, "I need to caution you, if not prevent you from arguing that conversation because you are the only witness."  The circuit court then stated that Prosecutor was basically barred from making any argument regarding the FOF.

Just prior to instructing the jury, the circuit court stated to the jury the following:

> The Court has made the following finding of fact, ladies and gentlemen of the jury.  There was an oral communication between [Complainant] and [Prosecutor] on Sunday, July 27, 2008.  [Complainant] stated to [Prosecutor] that [Akuna] said to her on August 24, 2007, "Don't you want to fool around with anyone," or words to that effect.

## II. STANDARDS OF REVIEW

### A. Judicial Misconduct

"Where judicial misconduct or bias deprives a party of the impartiality to which he or she is entitled, a new trial may be required. However, reversal on the grounds of judicial bias or misconduct is warranted only upon a showing that the trial was unfair." State v. Hauge, 103 Hawai'i 38, 48, 79 P.3d 131, 141 (2003) (brackets omitted) (quoting Aga v. Hundahl, 78 Hawai'i 230, 242, 891 P.2d 1022, 1034 (1995)).

### B. Harmless Error

HRPP Rule 52(a) provides, in relevant part, that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." The Hawai'i Supreme Court has stated that "[s]uch error, however, should not be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect to which the whole record shows it is entitled." State v. Sprattling, 99 Hawai'i 312, 320, 55 P.3d 276, 284 (2002) (internal quotation marks, citation, and brackets in original omitted). Under the harmless error standard, the appellate court "must determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Pauline, 100 Hawai'i 356, 378, 60 P.3d 306, 328 (2002) (internal quotation marks and citation omitted). "If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside." State v. Gano, 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999) (internal quotation marks and citation omitted).

"A constitutional error is harmless as long as the court is able to declare a belief that it was harmless beyond a reasonable doubt." Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan, 87 Hawai'i 217, 245, 953 P.2d 1315, 1343 (1998) (internal quotation marks, citation, brackets, and ellipsis omitted).

15

## III.  DISCUSSION

Akuna contends the circuit court erred and violated his constitutional rights to confrontation,[3] to present a defense,[4] to a jury trial, and to a fair trial when the court read its own FOF to the jury regarding Complainant's prior statement.  Akuna maintains that he was denied his right to have the jury, rather than a judge, find all of the facts and that the error was not harmless beyond a reasonable doubt because it relates to his inability to fully impeach Complainant's credibility, which was of paramount significance in this case.

Just prior to instructing the jury, the circuit court stated to the jury the following:

> The Court has made the following [FOF], ladies and gentlemen of the jury.  There was an oral communication between [Complainant] and [Prosecutor] on Sunday, July 27, 2008.  [Complainant] stated to [Prosecutor] that [Akuna] said to her on August 24, 2007, "Don't you want to fool around with anyone," or words to that effect.

We agree that in reading the FOF to the jurors, the circuit court violated Akuna's rights to a fair trial and a jury trial, rights encapsulated in the Sixth Amendment of the United States Constitution (providing that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury"), and article I, sections 5 and 14 of the Hawai'i Constitution (providing respectively that "[n]o person shall be deprived of life, liberty or property without due process of law" and "the accused shall enjoy the right to a speedy and public trial by an impartial jury").

HRE Rule 1102 provides:  "The court shall instruct the jury regarding the law applicable to the facts of the case, but

---

[3]  The right to confrontation is embodied in the Sixth Amendment of the United States Constitution, which provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"  That right is also encapsulated in Article 1, section 14 of the Hawai'i Constitution, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against the accused."

[4]  The right to Due Process is encapsulated in the Fifth and Fourteenth Amendments to the United States Constitution.  The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  The Fourteenth Amendment provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law."

shall not comment upon the evidence. It shall also inform the jury that they are the exclusive judges of all questions of fact and the credibility of witnesses." "The rationale behind the Rule is that judicial comment upon evidence risks placing the court in the role of an advocate." State v. Nomura, 79 Hawai'i 413, 417, 903 P.2d 718, 722 (App. 1995). "It is essential that the presiding judge endeavor at all times to maintain an attitude of fairness and impartiality." Id. (internal quotation marks, citation, and ellipsis omitted).

In Stallworth v. Boren, 99 Hawai'i 287, 54 P.3d 923 (App. 2002), this court stated that

> [i]t is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable.

Id. at 306, 54 P.3d at 942 (quoting Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 35 (1944)).

"The Hawai'i Supreme Court has adhered for over 140 years to the fundamental principle, which lies at the foundation of jury trial in every country blessed with that institution, that the jury is to pass upon the facts and the court upon the law. Thus, the jury is the sole judge of witness credibility and the weight of the evidence." State v. Brown, 97 Hawai'i 323, 333, 37 P.3d 572, 582 (App. 2001) (internal quotation marks and citations omitted).

The instant case is similar to Hauge. There, during closing argument, Hague's counsel discussed perceived inconsistencies between two witnesses' descriptions of a video camera and a Hard Rock Café bag:

> The video camera itself. Mr. Khatib, in certainty, he said that he was certain that the video camera Hauge brought to him to pawn was tan and gold. That is his testimony. There's no way around that. His testimony is that the video camera that was attempted to be pawned was tan and gold.
>
> How did the Ordways describe their video camera? Black and silver. This is not the same camera that was taken from the Ordways. These are two totally separate items. But what's happened here is that Mr. Hauge is being blamed for something he did not take.

17

> Mr. Khatib described this Hard Rock Café bag as being brown and paper.  The Ordways described their Hard Rock Café bag as being white and plastic.
>
> At this point, the circuit court interrupted [Hauge's counsel]:
>
> THE COURT:  Counsel, she says it was paper, okay.
>
> [Hauge's counsel]:  And Mrs. Ordway said it was white and paper, two totally separate descriptions of the evidence.
>
> [The State]:  Excuse me.
>
> THE COURT:  He said tan and paper.  Let's stick to the facts, all right?  The jury is asked to disregard that last remark by counsel.

Id. at 46-47, 79 P.3d at 139-40 (ellipses omitted).  Hauge was convicted, id. at 41, 79 P.3d at 134, and on appeal, he argued that the court's comment, "He said tan and paper," had been improper because it violated HRE Rule 1102.  Hauge, 103 Hawai'i at 58, 79 P.3d at 151.  The Hawai'i Supreme Court agreed, but ultimately found that the court's instructions to the jury cured the impropriety.[5]  Id. at 59, 79 P.3d at 152.

Although the relevant issue in State v. Crail, 97 Hawai'i 170, 35 P.3d 197 (2001), was the circuit court's improper finding of facts in the jury's instructions, Crail provides guidance in this case.  There, after a jury trial, Defendant Darrel M. Crail (Crail) was convicted of promoting a Dangerous Drug in the Third Degree and Unlawful Use of Drug Paraphernalia.  Id. at 172, 35 P.3d at 199.  The Hawai'i Supreme Court summarized the following relevant background:

> The court instructed the jury on August 18, 1999.  Instruction No. 18 read as follows:
>
> As to Count I, in order for you to find [Crail] guilty of the offense of Promoting a Dangerous Drug in the

---

[5]  The circuit court instructed the jury as follows:

You must disregard any remark I may have made unless the remark was an instruction to you.  If I have said or done anything which has suggested to you that I am inclined to favor the claims or positions of any party of *if any expression or statement of mine has seem[ed] to indicate* an opinion relating to which witnesses are or are not worthy of belief, or *what facts are or are not established*, or what inferences should be drawn therefrom, *I instruct you to disregard it.*

Hauge, 103 Hawai'i at 59, 79 P.3d at 152 (emphases in original).

Third Degree, you must unanimously answer at least one of the following questions with a "yes" response on the special interrogatory form which will be provided to you:

Did you unanimously find beyond a reasonable doubt that [Crail] was *in actual or constructive possession* of any one of the following:

1.  State's Exhibit 1-methamphetamine found in the glass cylindrical pipe located *inside of jeans shorts in the bathroom of bedroom # 1.*

Yes_____ No_____

2.  State's Exhibit 2-methamphetamine found in five ziploc packets that were in a larger ziploc bag, *located on the folding mattress in bedroom # 1.*

Yes_____ No_____

3.  State's Exhibit 3-methamphetamine found in four ziploc packets *that were in a plastic container located under the mattress near the small refrigerator in bedroom # 1.*

Yes_____ No_____

4.  State's Exhibit 4-methamphetamine found on the Calibron twin beam scale, *located on the top of the refrigerator in bedroom # 1.*

Yes_____ No_____

If you are not unanimous in finding beyond a reasonable doubt that [Crail] was in either *actual or constructive possession* of at least one of the above listed items, then you must find [Crail] not guilty of the offense of Promoting a Dangerous Drug in the Third Degree.

(Emphases added.)  In a similar vein, the court instructed the jury regarding Count II as follows:

As to Count II, in order for you to find [Crail] guilty of the offense of unlawful possession of drug paraphernalia, you must unanimously answer at least one of the following questions with a "yes" response on the special interrogatory form which will be provided to you:

Did you unanimously find beyond a reasonable doubt that [Crail] was in actual or constructive possession of any one of the following:

1.  State's Exhibit 1-Glass cylindrical pipe containing methamphetamine residue, found inside of jeans shorts *in the bathroom of bedroom # 1.*

Yes_____ No_____

2.  State's Exhibit 4-Calibron twin beam scale, dark green in color, containing methamphetamine residue, *found on top of the small refrigerator in bedroom # 1.*

Yes_____ No_____

3.    State's Exhibit 40-One iron scraper with both
      ends flattened, *found on top of the circular
      table in bedroom # 1.*

Yes_____ No_____

If you are not unanimous in finding beyond a
reasonable doubt that [Crail] was in either *actual or
constructive possession* of at least one of the above
listed items, then you must find [Crail] not guilty of
the offense of unlawful possession of drug
paraphernalia.

    Instruction No. 20 (emphases added).

        In Instruction No. 5, the court provided the jury the
following definition of actual and constructive possession:

The law recognizes two kinds of possession:  actual
possession and constructive possession.  A person who
knowingly has direct physical control over a thing, at
a given time, is then in actual possession of it.

A person who, although not in actual possession,
knowingly has both the power and the intention, at a
given time, to exercise dominion over a thing, either
directly or through another person or persons, is then
in constructive possession of it.

Id. at 176-77, 35 P.3d at 203-04 (footnote omitted).

        Reviewing Crail's argument for plain error, id. at 180,
35 P.3d at 207, the supreme court found that the circuit court
harmfully erred by instructing the jury in Instructions 18 and 20
as to the places from which the exhibits were recovered or
located, as opposed only to the identification of the exhibits.
Id. at 181, 35 P.3d at 208.  At trial, Crail had put in issue the
location of all the drugs recovered because he claimed to be
unaware of the presence of any drugs in the residence.  Id. at
180-82, 35 P.3d at 207-09.  The supreme court vacated the
judgment and sentence and remanded the case for disposition
consistent with its opinion.  Id. at 183, 35 P.3d at 210.

        In the instant case, by finding before the jury that
"[t]here was an oral communication between [Complainant] and
[Prosecutor] on Sunday, July 27, 2008," and "[Complainant] stated
to [Prosecutor] that [Akuna] said to her on August 24, 2007,
'Don't you want to fool around with anyone,' or words to that

20

effect," the circuit court violated HRE Rule 1102[6] and usurped the jury's role as fact-finder. It was the jury's prerogative, not the court's, to decide whether the State had proven that Complainant told Prosecutor that Akuna had made the subject statement. The circuit court's other instructions to the jury did not cure the error. There were no instructions regarding the FOF read, without explanation, to the jury. Moreover, the circuit court's instructions as given were irreconcilably inconsistent on how the jury was to treat the FOF. On the one hand, the jury was told that, "You are the exclusive judges of the facts of this case." On the other, they were also instructed:

> You must also disregard any remark I may have made, unless the remark was an instruction to you.
>
> If I have said or done anything which has suggested to you that I am inclined to favor the claims or positions of either party, or if any expression or statement of mine has seemed to indicate an opinion relating to which witnesses are, or are not, worthy of belief or what facts are or are not established or what inferences should be drawn therefrom, I instruct you to disregard it.

Although the circuit court apparently intended to place before the jury the substance of Complainant's statements to Prosecutor without placing Prosecutor on the stand, these instructions may have caused the jury to disregard the FOF and thereby undercut Ahuna's credibility argument and confused their consideration of the FOF.

Given the contradictory nature of the instructions and because the FOF comprised evidence that may have cast doubt upon Akuna's and/or Complainant's credibility and because credibility was highly significant in this case, we cannot say that the circuit court's error was harmless beyond a reasonable doubt.

Given our holding on this issue, we need not address the remaining points of error.

---

[6] The prohibition against judicial comment on the evidence in HRE Rule 1102 is not limited to jury instructions. Hauge, 103 Hawai'i at 59, 79 P.3d at 152 (citing to HRE Rule 1102).

## IV.   CONCLUSION

We vacate the Judgment of Conviction and Sentence filed in the Circuit Court of the First Circuit on November 24, 2008 and remand this case for a new trial consistent with this opinion.

DATED:   Honolulu, Hawai'i, February 23, 2010.

On the briefs:

Karen T. Nakasone,
Deputy Public Defender,
for Defendant-Appellant.

Donn Fudo,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge